STATE of Missouri, Respondent,

v.

Marlin GRAY, Appellant.

No. 75496.

Supreme Court of Missouri,
En Banc.

Oct. 25, 1994.

As Modified on Denial of Rehearing
Nov. 22, 1994.

Mark Mittleman, Lawrence J. Fleming, Sp. Public Defenders, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

Because of his complicity in the deaths of Robin and Julie Kerry, defendant Marlin Gray was convicted of first degree murder and sentenced to death. § 565.020.[1] Following the convictions, a motion for post-conviction relief was filed, heard and denied. This Court has jurisdiction of the appeal. *Mo. Const. art. V, § 3.* The judgments are affirmed.

## I.

The first issue in this case has to do with the sufficiency of the evidence to support a conclusion that defendant knowingly caused the death of Julie or Robin Kerry after deliberation. The evidence is viewed in a light most favorable to the verdict, affording the state all reasonable favorable inferences and ignoring contrary evidence and inferences. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993).

Twenty-year-old Julie Kerry and her sister, nineteen-year-old Robin Kerry, made arrangements with their nineteen-year-old cousin, Thomas Cummins, to meet them shortly before midnight on April 4, 1991. Cummins, who was visiting at his grandparents' home in St. Louis, sneaked away shortly before midnight to meet the girls at a prearranged location. The Kerry sisters were intent on showing Cummins a graffiti poem the girls had painted on the Chain of Rocks bridge. The Chain of Rocks bridge had been abandoned some years earlier. It spans the Mississippi River at St. Louis and has been a site of drinking and partying by trespassers since its abandonment. The three arrived at the bridge, climbed through an opening in the fence, and went onto the Missouri side of the bridge.

Earlier that same evening, defendant Marlin Gray, Reginald (Reggie) Clemons, Antonio (Tony) Richardson and Daniel Winfrey met at the home of a mutual friend in St. Louis. The latter two individuals were juveniles, being sixteen and fifteen years old respectively. Defendant was the oldest and largest of the group. At defendant's suggestion, the four left for the Chain of Rocks

bridge to "smoke a joint" that defendant had acquired from someone at the house where the four met. The defendant's group had been at the bridge sometime before the Kerry sisters and Cummins arrived.

As the two victims and their cousin were walking toward the Illinois side of the bridge, they encountered defendant and his three companions. After a brief exchange of greetings, Winfrey asked for cigarettes, which were supplied by one of the Kerry sisters. As he had done earlier for his cohorts, defendant demonstrated to Cummins and the girls how to climb down a manhole on the deck of the bridge to a metal platform which leads to a concrete pier that supports the bridge. Defendant told Cummins the platform was a good place to be "alone with your woman." The two groups then separated, with the Kerrys and Cummins walking eastward toward Illinois and the defendant's group walking toward Missouri.

While walking away, Clemons suggested that they rob Cummins and the Kerrys. Defendant smiled, clapped his hands, and replied, "Yeah, I feel like hurting somebody." The four then turned and began walking back toward the east end of the bridge. While walking, Clemons and defendant engaged in some conversation. When defendant handed Winfrey a condom, he responded to the implication by saying he "wasn't going to do anything." At that point, defendant and Clemons pushed Winfrey against the bridge railing and said, "You're gonna do it." Winfrey then agreed to "do it."

The defendant's group continued walking toward the Illinois side and again came upon the Kerrys and Cummins. The girls were watching a campfire that had been built by someone on the Illinois side of the river. Richardson went to the side of the bridge and yelled something at the people by the campfire. At that point, the Kerrys and Cummins began walking back toward the Missouri side of the bridge. The defendant and his three associates followed at a close distance.

As the group passed a bend in the bridge, defendant, on a prearranged signal, put his

---

1. All references to statutes are to RSMo 1986, unless specified otherwise.

arm around Cummins and walked him back ten to fifteen feet telling him, "This is a robbery. Get down on the ground." Cummins complied. Defendant told Cummins that if he looked up, defendant would kill or shoot Cummins. At the same time, Clemons, Winfrey and Richardson grabbed Julie and Robin Kerry. The girls screamed. One of the assailants said, "[D]o you want to die?" and ordered the girls to stop screaming or the speaker would "throw you off this bridge." This statement, if not made by defendant, was made within earshot of defendant. Winfrey held Robin Kerry on the ground, covering her face with her coat. Clemons ripped off Julie Kerry's clothing and raped her as she was held by Richardson. At some point, while Julie and Robin were being raped by Clemons and Richardson, defendant went to Cummins, who was still lying face down on the ground. Defendant stated, "I've never had the privilege of popping somebody ... if you put your head up or try to look, I'm going to pop you." Defendant then went to where Winfrey was holding Robin Kerry on the ground. Defendant told Winfrey to watch Cummins. Then, with the assistance of Clemons, defendant tore off Robin Kerry's clothing and raped her. Clemons then forced Cummins to surrender his wallet, wristwatch, some cash and keys. Clemons apparently became agitated upon finding Cummins firefighter's badge, thinking he might be a police officer. One of the assailants then forced Cummins to get up and, while holding Cummins' head down so he could not see who it was, walked him a short distance on the bridge and made him lie down again. There defendant and Winfrey warned Cummins not to talk to police. One of them showed Cummins his driver's license and said, "We know who you are and if you tell anybody, we're going to come and get you." Cummins heard two voices discussing whether he would live or die.

While defendant was in the act of raping Robin Kerry, Richardson forced Julie Kerry into the manhole and followed her. When defendant finished, he went to Winfrey, who was still watching Cummins, and asked where Richardson had gone. Winfrey pointed toward the Missouri side of the river. Defendant then ran off toward the Missouri side in search of Richardson and Julie Kerry, running past the manhole. According to defendant, he thought Richardson had taken her "to the end of the bridge, where he could take her by the river and maybe drown her or somethin'."

Clemons, after completing his rape of Robin Kerry, forced her down the same manhole where Richardson had taken Julie. Clemons then returned to Cummins and, putting Cummins' coat over his head, forced him down the same manhole where Richardson and the two girls were located. Clemons then followed, as did Winfrey. However, Winfrey was told by Clemons to go find the defendant, which he did.

Clemons ordered Cummins and the Kerry sisters to step out onto the concrete pier below the metal platform. The three were told not to touch each other. Julie Kerry and then Robin were pushed from the pier of the bridge, falling a distance of fifty to seventy feet to the water. Cummins was then told to jump. Believing his chances of survival were better if he jumped instead of being pushed, he jumped from the bridge.

Meanwhile, Winfrey caught up with defendant. The two were returning back onto the bridge and were near a rock pile at the entrance of the bridge when they were met by Clemons and Richardson. Clemons said, "We threw them off. Let's go." The group ran to their car, drove to a gas station in Alton, Illinois, and bought food and cigarettes with the money they had taken from the victims. The group then drove to an observation point over the Mississippi River called the Chair, where they sat and watched the river. While there, Clemons remarked, "They'll never make it to shore." Defendant praised Richardson for being "brave" to push the Kerry sisters off the bridge.

Later, in police custody, defendant admitted to participating in raping both of the girls but denied that he had been involved in the murders. His tape recorded statement, although he claims it was obtained by police coercion, was admitted in evidence and was consistent in most essentials with the above statement of facts.

Although Cummins survived and testified at trial, Julie and Robin Kerry were killed. The body of Robin Kerry was never recovered. Julie Kerry's body was found three weeks later in the Mississippi River by the sheriff of Pemiscot County, Missouri.

## II.

■ The defendant argues that the above evidence is insufficient to demonstrate that defendant knowingly caused or acted with others to cause the death of Julie or Robin Kerry after deliberation. "Deliberation" means cool reflection for any length of time, no matter how brief. § 565.002(3). Thus, in order to convict, there must be some evidence that defendant made a decision to kill the victims prior to the murder. *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993).

The state responds by arguing that defendant's participation in planning to commit the crimes of robbery and rape together with the threats to kill the victims that were made either by defendant or in his presence in the course of the rape and robbery, and defendant's statement after the killing that those who did the acts were "brave" are sufficient facts to infer that the defendant deliberated on the killing of Robin and Julie Kerry. Deliberation may be inferred from the acts of forcing the victims into the manhole, off the metal platform onto the concrete pier and then pushing the two victims from the pier. If defendant was shown to have participated in any of those acts, deliberation on the killing might be inferred. However, he was not shown to have participated in those acts.

■ A distinct question is whether defendant's participation in the planning and execution of the rape and robbery are sufficient to infer deliberation of murder. Implicit in any forcible rape or robbery is that threats are made against the victim to accomplish the criminal purpose. Forcible rape and first degree robbery each require the use of force or threat of force as elements of the crime. §§ 566.030 and 569.020. A homicide committed during the perpetration of those or other felonies is second degree murder. § 565.021.1(2). Had the legislature intended to impose the most severe punishment for participating in the planning or execution of a forcible rape or robbery where death to a person results from the perpetration of those crimes, it could have so provided. However, no such provision was made. The statute requires not merely the deliberation of forcible rape and robbery, but deliberation of the killing of a person. The legislature has made the distinction between first degree murder and second degree felony-murder. To hold otherwise would mean that every homicide that occurs during a forcible rape or first degree robbery would be first degree murder and the felony/murder provisions of § 565.021.1(2) would be meaningless. However, that is not what the statute provides. We must abide by the legislatively created distinction. As *O'Brien* makes clear, more is required than the planning and execution of a crime involving the use of force.

■ In cases of accessory liability for first degree murder, evidence of at least three circumstances appears to be highly relevant in determining if accomplice deliberation may be inferred. The first circumstance is where there is a statement or conduct by the defendant or a statement or conduct by a codefendant in the presence of defendant prior to the murder indicating a purpose to kill a human. *State v. Isa*, 850 S.W.2d 876, 882–83 (Mo. banc 1993) (upon hearing her husband say, "[T]his is the last day. Tonight, you're going to die.", Isa continued to cooperate with her husband in the inquisition of the victim and subsequent murder); *State v. Six*, 805 S.W.2d 159, 165 (Mo. banc 1991) (Six held a knife to the throat of the victim's mother and later slit the throat of the victim's mother. The victim, abducted by defendant and a cohort, was later found dead with her throat cut); *State v. Roberts*, 709 S.W.2d 857, 860 (Mo. banc 1986) (Roberts incited a prison melee with "Let's rush them," and held the guard for others to stab to death); *State v. Betts*, 646 S.W.2d 94, 95 (Mo. banc 1983)(Betts and another planned a burglary and agreed anyone found home would be killed); *State v. Lindsey*, 507 S.W.2d 1, 2 (Mo. banc 1974) (Lindsey's partner said, "Wait here, I am going to get a bat because I am going to kill somebody to-

night." On the partner's return, Lindsey agreed he was ready).

A second circumstance permitting an inference of accessory liability is evidence that the murder was committed by means of a deadly weapon and the accomplice was aware that the deadly weapon was to be used in the commission of a crime. *State v. Turner*, 623 S.W.2d 4, 6–7 (Mo. banc 1981) (initially planning to commit robbery, Turner knew his comrade had a gun and a knife. Turner entered the store and observed his codefendant beating and stabbing the victim); *Lindsey*, 507 S.W.2d at 2 (Lindsey knew his partner carried the bat intending to kill someone with it); *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980) (Strickland participated in a triple homicide by holding the victims at bay with a shotgun).

A third factual circumstance common in first degree murder cases where accomplice deliberation is found to exist is where there is evidence that the accessory either participated in the homicide or continued in the criminal enterprise when it was apparent that a victim was to be killed. *Isa*, 850 S.W.2d at 883 (Isa grabbed and held her daughter as the husband stabbed the daughter); *Roberts*, 709 S.W.2d at 860 (Roberts held the prison guard while other inmates stabbed a guard to death); *Turner*, 623 S.W.2d at 6–7 (Turner, upon his late arrival at the scene of a robbery, hit the victim in the head with a beer bottle after a cohort had stabbed and beat the victim); *Lindsey*, 507 S.W.2d at 4 (Lindsey continued in the plan to rob after he knew his partner got a bat and told of his intent to kill).

Here there were threats to kill made either by the defendant or in the defendant's presence. In addition, the defendant at one point stated he would shoot Cummins, indicating that he had ready access to a deadly weapon, even though no weapon was actually displayed or used to commit the homicides in this case. The jury was entitled to believe defendant had a gun. Defendant continued in the criminal enterprise after the threats to kill the victims were made. After the threats, he held Cummins at bay while the rapes were committed. Defendant partici-

pated in a discussion about whether Cummins should be killed, followed moments later by an attempt on Cummins' life and the two homicides. These facts, together with defendant's statement that he felt like hurting somebody, his role as a leader and enforcer in the group, and his belief before leaving the bridge that Richardson had gone to drown Julie Kerry in the river, are sufficient evidence to permit an inference by the jury that defendant had a conscious purpose of committing the acts in which he engaged so that the victims would be killed and that the homicides occurred after he coolly deliberated on the deaths for some amount of time, however short.

The facts in this case stand in stark contrast to those in *O'Brien*. The defendant there made an agreement with his codefendant to commit a strong-arm robbery. O'Brien's role was to lure the victim into an alley so his codefendant could commit the robbery. No deadly weapons were used or threatened to be used by O'Brien and none was displayed in his presence. No threat to kill was made by defendant or in defendant's presence. O'Brien departed the alley before the codefendant actually engaged in the egregious beating which resulted in the victim's death. O'Brien did not continue in his participation after it became apparent by threats or acts that deadly force would be used. In that case, this Court reversed the first degree murder conviction due to insufficiency of the evidence of deliberation. *Id.* at 220.

As in *O'Brien*, the defendant here was not present when the victims were murdered. However, nothing in *O'Brien* suggests that in order to have deliberation, an accessory must actually have been present when the murder occurred. It is the threats to kill the victims made by defendant and threats of such force by others in defendant's presence that distinguishes *O'Brien* from this case. The totality of the evidence here permits an inference of deliberation. Thus, the claim of insufficient evidence of deliberation on the purpose to kill fails.

### III.

The defendant also argues that the trial court committed plain error during the ques-

tioning of the jury venire. During the voir dire, the trial judge used several examples to explain to potential jurors the concepts of accessory liability for crime and reasonable doubt.

The voir dire was conducted in panels of twelve or more. While the statements and questions asked by the trial judge were slightly different with each panel, the following were typical:

In fact, I defined [reasonable doubt] to you a couple days ago when I read that long instruction to you. I told you that proof beyond a reasonable doubt is proof that leaves you firmly convinced and it's not proof beyond all doubt, it's just proof beyond a reasonable doubt.

Probably all twenty-one of you have a different definition in your mind as to what proof beyond a reasonable doubt is and that's fine. Everybody's got a different, different set of rules in their own mind in terms of what reasonable doubt is, but that's the standard. It's not proof beyond all doubt.

Let me give you something that I think will either confuse the heck out of you or make it more clear. Hopefully it will make it more clear. If you're charged with a speeding ticket driving down the highway, you're doing ten miles over the limit or you're charged with doing ten miles over the limit, a policeman stops you and you go into the city court and you plead not guilty and you want a trial.

At the trial the prosecutor is going to have to prove for this ten dollar traffic ticket that you are guilty beyond a reasonable doubt. That's the standard of proof because it's a criminal case, okay. For a ten dollar fine, that's what we're talking about.

By the same token when we're talking about a death penalty case, the most severe type of case we have in our society for the State to win his or her case, the State has to prove the defendant's guilt beyond a reasonable doubt. It stays the same, doesn't matter what the punishment is. The burden of proof for the prosecutor doesn't go up and down based upon punishment.

It's the same for a traffic ticket, a rape, robbery, burglary, stealing, drug possession, drug sale, murder, mass murder, child abuse, you name the charge, it all stays the same, proof beyond a reasonable doubt. It doesn't go up and down.

Now many of you would probably say, well, gee, this is a death penalty, I'd sure like all the evidence you have. Well, that's fine. And, you know, we'd all like a video, a video cassette of someone committing a crime before we put somebody in jail or not, but that's not the way life works.

Life works sometimes with imperfections and the law basically says that you will accept some of those minor imperfections and the State must therefore reach a burden, a sufficient burden, a strong burden of proof beyond a reasonable doubt, but they do not have to go past that burden simply because the punishment is more severe than perhaps in a traffic ticket or a robbery case. Does everybody understand that? Okay.

. . . .

The next issue I want to discuss is something that's called acting with another. That's a legal concept by which a defendant, in fact, in this case the defendant is charged with the murder in two cases, but he's charged as acting with other people. We don't have to worry about those other people as it relates to specifics of this issue today. We don't have to worry about their involvement.

Suffice it to say that he is charged with these two crimes acting with other people. Now let me give you two examples that I think will make the situation easy to follow for you. Joe and Mike are going to rob a bank. Joe's in the car. He pulls up in front of the bank. Mike's going to go up, he takes a gun with him, robs the bank, and shoots a teller.

Joe is sitting out in the car with the engine running. He doesn't have anything to do with shooting anybody, really didn't shoot, didn't pull any trigger, didn't take the money. He's in the car. He aided and assisted, abetted, was involved in this case. He's just as guilty of murder, if the jury

would have found it such, he would be just as guilty of murder as the guy that pulled the trigger. That's a similar situation to what the defendant is charged with here, acting with another.

Another example I've been giving the jurors, Joe and Mike are in an alley and they find Harry who they don't like. They get into a fistfight with Harry. Joe's holding Harry. Mike picks up a knife, stabs Harry. Mike picks up a brick, hits Harry in the head. Mike picks up a gun, shoots Harry. Joe and Mike are both guilty of murder in the first degree even though one guy is holding. The guy that's holding is just as guilty as the guy shooting, stabbing, or hitting.

Does everybody understand that? That's what acting with another means. It doesn't mean, hey, Mike just happened to be walking down the alley and was there. It has to be more than that. He has to be involved in it. It has to be more than just, hey, I'm here on the bridge. Has to be I'm involved in the case, I'm involved, I aided, I assisted, I abetted the murder of these two girls. Everybody understand that? Okay.

■ No objection was made to the above statements. Thus, review is limited to the standard of plain error. *State v. Hunter*, 840 S.W.2d 850, 859 (Mo. banc 1992). "Plain error relief is appropriate only when the alleged error so substantially affects the rights of the defendant that a manifest injustice or miscarriage of justice results." *Isa*, 850 S.W.2d at 884; *Rule 29.12(b)*.

■ The trial judge was not making any improper attempt to obtain a prior commitment by jurors to decide a fact issue in the case in advance. The purpose was to discover any juror bias. In order to discover bias of potential jurors, it is often necessary to reveal some factual or legal detail in voir dire. *State v. Antwine*, 743 S.W.2d 51, 58 (Mo. banc 1987). In determining how much detail to divulge, trial judges are given substantial discretion. *Id.* at 58–59. The judge had two well-intended specific purposes for the above-quoted statements and questions. The first was to determine if any potential juror held a fixed opinion that only a person who commits the act of murder may be held criminally responsible, making it impossible for that juror to follow instructions regarding the liability of an accomplice for the crime. The second purpose was to ask if the potential jurors would hold the state to a higher standard of proof in a first degree murder case than the state is held to in any other criminal case.

Despite his well-intended purposes, the judge said far more than was necessary in this case. If the venire must be questioned regarding their attitudes toward accessory liability or toward the concept of reasonable doubt, the question should be brief, clear and carefully crafted in advance to ensure that the questioner, whether the trial court or an attorney, avoids the appearance of giving an instruction of law or commenting on the evidence. Usually a simple, well-prepared question is better than the extemporaneous and occasionally redundant hypothetical cases used here.

The purpose of the Approved Jury Instructions is to avoid confusion among jurors. That purpose is undermined when a judge or lawyer, under the guise of voir dire, makes what seem to be comments on the law or facts in the case. This Court has announced that during delivery of the approved instructions, a trial court's "lengthy oral explanations, talks, comments, chats, homilies or whatever they may be called, invite[ ] confusion and disagreement later among the jurors as to exactly what the judge did say and whether his oral remarks prevail over the written instructions or vice-versa." *State v. Cross*, 594 S.W.2d 609, 610 (Mo. banc 1980). Such commentary during voir dire risks incomplete or inaccurate statements and may conceivably lead to confusion.

Notwithstanding this criticism of the comments during voir dire, the comments do not constitute plain error. The comments were not made during the delivery of the instructions at trial as was the case in *Cross*. Also, the jury instructions submitted by the court on the concepts of reasonable doubt and accessory liability had the effect of correcting any potentially misleading statements that might have resulted from the voir dire.

However, both judges and lawyers should be circumspect when commenting on facts or concepts of law during voir dire.

## IV.

 Defendant further argues that counsel was ineffective for failing to object to these comments by the trial judge. Not every failure to object even if the objection might be sustained is tantamount to ineffective assistance of counsel. *Antwine v. State,* 791 S.W.2d 403, 410 (Mo. banc 1990). One of the elements necessary to establish a constitutional claim for ineffective assistance of counsel is that the accused was prejudiced because the lawyer's conduct of the defense was so deficient as to undermine the court's confidence in the outcome of the case. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Here the written instructions which were given to the jurors after they were sworn and taken by the jurors with them for their deliberations made clear that the jurors were to base their decision on the facts presented during the trial and on those written instructions. *See MAI–CR3d 300.02, 302.01, 302.02, 302.03.* As will be more fully discussed hereinafter, there was no prejudicial error in the written instructions. Thus, counsel's failure to object to the trial judge's comments during voir dire, if the comments were error, does not undermine this Court's confidence in the outcome of the case.

## V.

Defendant argues that his counsel at trial was ineffective in failing to interview or depose Daniel Winfrey until the eighth day of the trial. Winfrey testified on behalf of the state during the trial. Defendant claims prejudice because an earlier interview or deposition would have disclosed that defendant was not present when the murders occurred and that counsel should have developed a theory of defense around that testimony.

The record reflects that trial counsel was provided with a written copy of Winfrey's confession many months before trial. In that confession made to juvenile authorities in St. Charles County, Winfrey indicated that defendant was not present when the victims were pushed from the Chain of Rocks bridge. However, the statement implicated defendant as a perpetrator in the rapes and robbery. On September 30, 1992, Winfrey pled guilty to two counts of second degree murder and other offenses and agreed to testify against his codefendants. On October 2, 1992, trial counsel received a copy of Winfrey's plea agreement indicating his intent to testify at defendant's trial then set to commence on October 5, 1992. At the same time she was provided with a more extensive statement from Winfrey, again indicating that defendant was not present when the victims were pushed to their deaths.

Trial counsel moved to strike Winfrey as a witness because of the lateness of the new statement. While that motion was denied, counsel's request for an interview was granted. Winfrey was interviewed by trial counsel for an hour and a half on the evening of October 13, prior to his testimony being given the following day. The prosecutor, co-defense counsel and an investigator for the prosecutor's office were present at the interview.

Trial counsel testified that defendant informed her from the beginning that he was not only absent when the victims were pushed into the river, but he asserted he was not involved in the rapes or robbery. Defense counsel was aware early on that Winfrey might testify and his testimony was inconsistent with the defendant's assertions of innocence. Nevertheless, the defense's primary theory was to prove that defendant took no part in any of the criminal activity. At the same time, the defense theory was designed to portray Winfrey as a liar whose only purpose in testifying was to "save his own hide" from a first degree murder conviction. Defense counsel stated that she chose to rely on the written statements and interviews rather than a deposition of Winfrey, knowing that at a deposition the state would likely take the opportunity to prepare the witness to ensure consistent testimony. Defendant was fully aware of these defense theories in advance of trial.

 To prevail on a claim of ineffective assistance of counsel, a claimant must

establish (1) counsel's performance was deficient and (2) that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In determining if performance is deficient, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strategic choices made after a thorough investigation are virtually unchallengeable and a strategic choice made after an incomplete investigation is evaluated for reasonableness based on all circumstances, giving great deference to counsel's judgment. 466 U.S. at 690–91, 104 S.Ct. at 2066.

■ As previously noted, defense counsel had copies of statements made by Winfrey implicating defendant. Winfrey's testimony at trial was completely consistent with the earlier statements and interviews, and his direct testimony was quite clear in showing that defendant was not present when the murders were committed although he participated in the rapes and robbery. Thus, no purpose would have been served by cross-examining Winfrey further regarding defendant's absence. Given the great deference which matters of strategy are accorded, trial counsel's decision not to depose or interview Winfrey and not to rely primarily on the theory of defendant's absence at the time of the actual murders was not deficient performance of counsel.

■ Even if counsel should have interviewed or deposed Winfrey earlier than she did, defendant points to no evidence showing such investigation would have disclosed exculpatory or mitigating facts of which counsel was unaware when she made the decision to adopt the primary defense theories. It is not enough that some misstep of counsel had some conceivable effect on the outcome of the case. The particular failure must be so significant as to demonstrate a reasonable probability that but for counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Here it is pure speculation that had counsel interviewed or deposed Winfrey early on, a different trial strategy would have been developed resulting in a different outcome. In sum, defendant has established neither the deficient performance

nor the prejudice prong of the *Strickland* test.

## VI.

Gray next argues that certain inquiries by the court and state during the voir dire violated constitutional standards and resulted in striking otherwise qualified jurors for cause. The court allowed inquiries of potential jurors to determine whether they could consider the death penalty in cases where the defendant was charged as an accomplice and the state relied in part on circumstantial evidence. Typical of the exchanges on the two topics are the following:

MR. MOSS: Okay. Could you consider the death penalty for a person even though that person, for example, wasn't the actual—by the way, for your general information, as the Judge has indicated there are three other people also charged here. They're charged acting together. If you found that the defendant himself did not actually push the individual into the water, could you still consider the death penalty depending upon what other circumstances you hear? Do you understand?

VENIREMAN JEANETT BEIER: (No response.)

MR. MOSS: You know, if he's charged acting with three other individuals, Daniel Winfrey, Antonio Richardson, and Reginald Clemmons, could you still consider the death penalty if he was not the actual person who pushed these girls into the water?

VENIREMAN BEIER: No.

. . . .

MR. MOSS: —Mrs. Beier, if the State's case depended in part upon circumstantial evidence, would that prevent you from considering the death penalty in this case? Now there's circumstantial and direct, I explained those types of evidence. Would it prevent you from considering voting to impose the death penalty?

VENIREMAN ANN CRAMER: Not from considering it, but I mean I—

MR. MOSS: Here, let's put it this way. Okay, if you're sitting down there in the jury room and there's eleven other people with you, you know, the question is would you say to yourself well, I personally cannot vote to impose the death penalty because part of the state's case rested on circumstantial evidence? Would you say I cannot vote for the death penalty because part of their case rested on circumstantial evidence?

VENIREMAN CRAMER: Yes.

A potential juror may be excluded for cause when such person's views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985). In order to ascertain whether a potential juror's views would substantially impair the ability to perform his duties in accordance with the instructions, revelation of some portion of the facts of a case on voir dire is necessary. *State v. Antwine*, 743 S.W.2d at 58. The trial court's discretion in controlling the manner and extent of questioning on voir dire will be upheld absent abuse. 743 S.W.2d at 59. The party asserting abuse has the burden of demonstrating "a real probability that he was thereby prejudiced." *Id.*

While the comments of the court and the state during voir dire might have been more carefully crafted to disclose only those facts essential to the inquiry, there is no abuse of discretion. The purpose of voir dire is "to determine which persons harbor bias or prejudice against either party which would make them unfit to serve as jurors in the case before them." 743 S.W.2d at 60. The court did not abuse its discretion in allowing such questions to determine if the potential juror could consider the full range of punishment for a crime in which the defendant was charged as an accessory.

Defendant also asserts that counsel's failure to object to that inquiry during voir dire constituted ineffective assistance of counsel. As noted previously, not every failure to object is tantamount to ineffective assistance of counsel. *Antwine v. State*, 791 S.W.2d at 410. Also as previously noted, the lawyer's conduct of the defense must be so deficient as to undermine the court's confidence in the outcome of the case. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Here the defense counsel at one point did object to the state's question for going too far into the facts, and that objection was sustained. Defense counsel's failure to object to other inquiries during the voir dire does not disclose a reasonable probability that but for such objection the results of the proceeding would have been different, and that confidence in the outcome is thereby undermined. This claim of ineffective assistance of counsel is denied.

VII.

Gray contends that three venirepersons, Passanise, Glover, and Criss were improperly excused for cause because of their views on capital punishment. Glover and Criss indicated during the state's voir dire that they would require a higher burden of proof than reasonable doubt to impose the death penalty even if the court instructed them differently. However, during defense counsel's voir dire, each indicated they could set aside personal preferences and consider the death penalty using the reasonable doubt standard. Glover, when directly questioned by the court as to whether he could follow the reasonable doubt instruction in assessing the death penalty, stated, "I don't think I could follow the instruction." To the same inquiry, Criss replied, "I probably think that I would need more than reasonable doubt."

Passanise indicated at one point during the voir dire that it might be possible under certain circumstances for the state to change his long-standing convictions against the death penalty. The prosecutor finally asked, "I'm asking you based upon your opinion, are you always going to vote against the death penalty?" Passanise replied, "Yes, sir."

Each venireperson expressed an inability to determine guilt using the appropriate burden of proof when the death penalty could be imposed. A prospective juror may be excused for cause if the juror's views on capital punishment would "prevent or sub-

stantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852. The trial court's findings that the juror's performance of duties would be substantially impaired is entitled to deference. *Wainwright,* 469 U.S. at 428, 105 S.Ct. at 854. Venirepersons may properly be excused if their views would preclude following instructions given by the court, including the inability to follow instructions regarding the burden of proof as to the death penalty. *State v. Debler,* 856 S.W.2d 641, 645 (Mo. banc 1993); § *494.470.2,* RSMo Supp.1993. There is no indication that the trial court abused its discretion in excusing venirepersons Passanise, Glover and Criss.

## VIII.

Defendant next challenges the trial court's failure to sustain defendant's motion to strike venirepersons David Kozoloski and Elizabeth Conway for cause. Both venirepersons indicated a preference for the death penalty in a first degree murder case. However, each stated they would be more inclined to impose a life sentence if defendant tried to prevent the other three from pushing the victims. Based on the two venirepersons' answers that they could "consider the full range of punishment," and consider life without parole, the court overruled defendant's motion. Defendant later used peremptory strikes to remove the two venirepersons.

In *State v. Schnick,* 819 S.W.2d 330, 334 (Mo. banc 1991), this Court made clear that the right to a list of qualified jurors from which to make peremptory strikes is not constitutional, but statutory. The relevant statute was amended and now provides that a potential juror's qualifications do not constitute grounds for a new trial or reversal if the juror was removed by a peremptory strike and did not serve. § *494.480.4,* RSMo Supp.1993. The new statute is procedural in nature and was effective prior to the appeal of this case. Application of the statute does not violate the prohibition against ex post facto laws. *Collins v. Youngblood,* 497 U.S. 37, 60, n. 4, 110 S.Ct. 2715, 2728, 111 L.Ed.2d 30 (1990); *State v.*

*Wings,* 867 S.W.2d 607, 608–09 (Mo.App. 1993). Because the two venirepersons did not serve as jurors, there was no reversible error.

## IX.

The prosecutor is asserted to have discriminated on the basis of gender and race in the exercise of peremptory strikes. In addition, defendant argues that the trial court erred in sustaining the state's objection to one of his peremptory strikes.

Defendant's compliance with Rule 30.06 on this point is questionable, at best. His challenge fails to direct the Court to specific page references from the record to support the argument, as required by our rules. *Rule 36.06(h); State v. Kitson,* 817 S.W.2d 594, 600 (Mo.App.1991); *State v. Cheeks,* 604 S.W.2d 30, 32 (Mo.App.1980). Defendant submits a long list of explanations made by the state for making its peremptory strikes which he claims are constitutionally insufficient as race neutral reasons to sustain the strikes. There is no attempt in the argument to match the alleged insufficient reasons given by the prosecutor with the appropriate venireperson. Except for the claim concerning venireperson Shoults, defendant makes no references to specific pages from the record to support the argument that the strikes were based on gender or race. Nevertheless, the Court will address *ex gratia* the challenge to the state's exercise of its peremptory strikes.

### A.

The Equal Protection Clause of the United States Constitution prohibits using peremptory challenges to exclude jurors on the basis of race. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). The requirements to establish a *Batson* claim are outlined in *State v. Shurn,* 866 S.W.2d 447, 456 (Mo. banc 1993):

[T]he defendant must object to the prosecutor's use of peremptory challenges as violating *Batson* and identify the cognizable racial group to which the stricken venirepersons belong. *State v. Parker,* 836 S.W.2d 930, 939 (Mo. banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 636, 121

L.Ed.2d 566 (1992). The state must then provide race neutral explanations for the peremptory challenges. *Id.* If the prosecutor articulates an acceptable reason, the defendant must prove that the state's proffered reasons were merely pretextual and in fact racially motivated. *Id.*

The state used eight of its original nine peremptory strikes on black venirepersons. Defense counsel made a timely *Batson* objection, requesting racially neutral reasons for the strikes. The prosecutor gave the following explanations: (1) Venireperson Kendrick had poor eye contact with the prosecutor and indicated she was not sure whether she could impose the death penalty, she was not sure the felony murder rule was fair, and she did not know if she could follow the instruction on accomplice liability; (2) Venireperson Butler was a psychologist who gave the prosecutor the impression she knew more about people and how they act, she indicated she could "maybe" put aside her feelings on the death penalty, and the prosecutor believed she was a leader who would not lead in his direction; (3) Venireperson Meekie was a teacher and the prosecutor's office had very bad luck with teachers, she had a friend or relative who had been arrested, she was the same age as Gray's mother, she had poor eye contact with the prosecutor, and her body language suggested that she was being deceptive in some answers; (4) Venireperson Henderson was unemployed, had a friend who had been convicted or arrested where mistreatment occurred by the police, didn't wear socks, which seemed to show a lack of respect for the court, and appeared hostile to the prosecutor; (5) Venireperson Gray had a significant problem with reasonable doubt and was weak on the death penalty; (6) Venireperson Fluelen wanted a higher burden of proof than reasonable doubt when the death penalty could be imposed, was the same age as Gray's mother, and crossed her arms in front of her when the prosecutor addressed her (apparently signaling something negative about her reaction to the prosecutor); (7) Venireperson Long stated she would have difficulty following the felony murder rule, was not strong on the death penalty, and was upset with the state's witness Winfrey for selling out his friends; and

(8) Venireperson Cole had stated she had religious convictions against the death penalty although she eventually stated she could consider it and she was the foreperson of a jury in a police mistreatment case where the burden of proof was lower than in a criminal trial.

 Trial judges are vested with considerable discretion in determining the plausibility of the prosecutor's reasons and whether the prosecutor purposefully discriminated in exercising peremptory strikes. *Shurn,* 866 S.W.2d at 456; *Parker,* 836 S.W.2d at 934. "To be sufficient the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried." *Shurn,* 866 S.W.2d at 456, *citing Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–24. The trial court found that all of the state's strikes except one were proper. "An appellate court will not overturn such a finding unless clearly erroneous." *Shurn,* 866 S.W.2d at 456. After examining the prosecutor's explanations, the trial court's decision was not clearly erroneous.

### B.

At trial the prosecutor challenged certain peremptory strikes by the defense as based upon race. The trial court refused to permit the defense's peremptory strike of venireperson Shoults. Defendant argues that *Georgia v. McCullum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), allows prosecutors to object if white defendants try to strike black jurors on racial grounds, but that it does not apply when the prosecutor alleges that a black defendant is striking a white juror based on racial grounds.

 *McCullum* has no language limiting its application to minority venirepersons. Indeed, it holds that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." *McCullum,* —— U.S. at ——, 112 S.Ct. at 2359. This Court has suggested, but not held, that *McCullum* only applies when the venireperson is a member of a racial minority. *See Parker,* 836 S.W.2d at 934 n. 1. Nevertheless, it is not the defendant's

right to have a jury of a particular composition that is protected by the *Batson* rule. Rather, the rule protects the equal protection rights of jurors and prohibits discriminating against jurors based upon race. *Powers v. Ohio*, 499 U.S. 400, 413–14, 111 S.Ct. 1364, 1372–73, 113 L.Ed.2d 411 (1991). The Equal Protection Clause protects not only members of minority groups but also persons who are members of a racial majority in a community. *Regents of University of California v. Bakke*, 438 U.S. 265, 294–299, 98 S.Ct. 2733, 2750–53, 57 L.Ed.2d 750 (1978). *McCullum* is applicable to prevent racially motivated strikes of venirepersons, regardless of the race of the defendant or the venireperson.

 Having determined that *McCullum* applies, the issue is whether the trial court's decision to refuse the peremptory striking of Shoults was clearly erroneous. The trial court stated, "... My impression is that there was, the only reason I can think of for striking him is him being an older white male." At that point, defense counsel made no attempt to call to the court's attention any previous discussion regarding Shoults' statement that he was a crime victim twenty-five years earlier or that he had previously served on a jury. The trial court's determination of whether a peremptory strike was exercised on racially neutral grounds is entitled to great deference on appeal. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21, *State v. Antwine*, 743 S.W.2d at 66. The determination is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made. *State v. Antwine*, 743 S.W.2d at 66. Additionally, defendant claims that allowing Shoults to remain on the venire was clearly erroneous because it accepted reasons of prior jury service and being a former crime victim for striking venireperson Statzel. However, Statzel had been a victim of a robbery eight years earlier, when Shoults had been a victim of a car theft twenty-five years earlier. Moreover, defense counsel did not mention those reasons when the trial court sustained the objection to strike Shoults. This Court is not left with the firm and definite conviction that a mistake has been made. Therefore, the trial court's deci-

sion to deny the defendant's peremptory strike of Shoults is not clearly erroneous.

### C.

Ten of the state's eleven peremptory strikes were exercised to strike female venirepersons. Except for venireperson Henderson, all of the venirepersons excluded by the state's peremptory strikes discussed in Part A were women. Also, the state exercised peremptory strikes for two additional female venirepersons, Deardorff and Milne. The prosecutor explained that venireperson Milne wanted all doubt excluded and was poor on acting with another. Because defendant did not object to the state's use of its peremptory strikes on the basis of gender discrimination, no explanation was given for striking venireperson Deardorff.

 After defendant's trial, the United States Supreme Court held that it is impermissible in the exercise of peremptory strikes to purposely discriminate on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, — U.S. —, —, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994). The defendant offers his "gender *Batson*" claim for the first time on appeal. A failure to make a timely *Batson* objection is fatal to such a claim. *Parker*, 836 S.W.2d at 935. As to those venirepersons where a timely *Batson* objection was made, the prosecutor's explanation for striking each of the females appears to be sufficiently gender neutral.

### X.

Defendant contends his due process right to a fair trial was violated and plain error occurred when the state cross-examined him about an earlier uncharged theft crime and then called rebuttal witnesses. Defendant further asserts for the first time on appeal that trial counsel's failure to object constituted ineffective assistance of counsel.

Defendant testified he worked for the St. Charles Multijurisdictional Enforcement Group (MEG unit) setting up sting operations. He said he went to St. Louis under the authorization of his MEG unit to develop more drug suspects. He explained he did not report the murders, rapes and robberies

on the bridge because he was going to tell his DEA friends the next time he saw them.

■ To refute the implication that defendant was acting as an employee of the MEG unit or out of public spiritedness, the state asked the defendant the circumstances of his connection with the police, including his motive for becoming involved with the MEG unit. He denied he acted as an informant in exchange for getting prior stealing charges dismissed. In response, the state called two police officers as rebuttal witnesses to testify regarding defendant's connection to the MEG unit. The police officers established that defendant worked for the MEG unit as an unpaid informant working off a prior uncharged theft crime, although they were precluded from testifying about the details of that offense. They also testified that defendant never got "authorization" to go to St. Louis to develop drug suspects.

■ The state could properly cross-examine defendant on his connection with the police. *State v. Rowe*, 838 S.W.2d 103, 110 (Mo.App.1992). Matters within the "fair purview" of the direct examination including collateral issues may be inquired into on cross-examination. Evidence of uncharged crimes that are independent of and logically relevant to a fact issue in the case may be admissible if the probative value outweighs the prejudice. *Id.* The trial court is in the best position to determine prejudicial effect.

■ Given defendant's testimony that he was not the most upstanding citizen, was involved in drugs and drug trafficking, and specifically admitted smoking marijuana, it cannot be said that the trial court plainly erred by not intervening *sua sponte*. The information elicited concerning his stealing charge did not result in manifest injustice. *Isa*, 850 S.W.2d at 884.

■ Defendant's assertion that his counsel was ineffective for failing to object to cross-examination questions was not raised before the motion court in his petition pursuant to Rule 29.15. Claims of ineffective assistance of counsel raised for the first time on appeal following a post-conviction relief hearing are procedurally barred. *Shurn*, 866 S.W.2d at 470. This claim is denied.

## XI.

■ Defendant next argues that Instruction No. 5 was an improper modification of MAI–CR3d 304.04, the general definition of accomplice liability. He claims the modification of Instruction No. 5 made the first degree murder verdict directing instructions, Instructions No. 6 and 13, confusing regarding deliberation. Instruction No. 5 states:

> Under Counts I and II and Instruction Nos. 6 . . . 13 [and other specifically numbered instructions] a person is responsible for his own conduct and he's also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

The accessory liability paragraph was submitted separately rather than repeating it in the beginning of each verdict director, as provided under Note on Use 3(a) of MAI–CR3d 304.04. Note on Use 3(b) of MAI–CR3d 304.04 authorizes a separate accessory instruction with a cross-reference to more than one verdict director if "the defendant is being tried for some offenses which he committed by himself and some which were committed jointly with another." Because all verdict directors in this case stated that the defendant acted with others, the cross-references in Instruction No. 5 were not in technical compliance with the Notes on Use to MAI–CR3d 304.04. When an MAI–CR instruction is applicable and is not given in accordance with the Notes on Use, it shall constitute error and its prejudicial effect is to be judicially determined. *Isa*, 850 S.W.2d at 902. "A defendant is prejudiced by an erroneous instruction when the jury 'may have been adversely influenced by [it].'" *Id.* (quoting *State v. Lingar*, 726 S.W.2d 728, 738 (Mo. banc 1987). Because the verdict directors on first degree murder properly required the jury to find the defendant personally deliberated in order to find him guilty of those crimes, Instruction No. 5 did not adversely influence the jury.

Defendant offers several other complaints that are raised for the first time on appeal.

More specifically, he argues that it was error to state at the end of Instruction No. 6, regarding Julie Kerry, "If you do find the defendant guilty under Count I of Murder in the First Degree, you will return a verdict finding him guilty of Murder in the First Degree." He also argues that the jury may have been confused by an extra word "the" that appears before Reginald Clemmons' name in both Instructions No. 6 and 13 and by including the elements of the crime of robbery and rape in some of the other instructions.

▆▆▆ Defendant claims that such complaints constitute plain error and require reversal. When error is raised for the first time on appeal, it is reviewed under the plain error standard and the court will not reverse the conviction unless the alleged error resulted in a manifest injustice or miscarriage of justice. *Rule 30.20; State v. Simpson,* 846 S.W.2d 724, 726 (Mo. banc 1993). After examining the alleged instructional errors raised for the first time on appeal, none of the errors misdirected the jury with regard to the law. The verdict directing instructions on first degree murder contained all of the necessary elements of the crime of first degree murder, including the requirement that defendant personally deliberate with regard to the killing of the victims. There was no plain error in the instructions, and Instruction No. 5 contains no prejudicial error.

### XII.

Defendant's next point is that the court erred in submitting Instructions No. 35 and 36, the aggravating factors instructions given during the punishment phase, because he claims the instructions are confusing, internally inconsistent, and unsupported by the evidence. The state concedes the instructions asked whether the murder of each victim was committed while the defendant was engaged in the homicide of that same victim. The pertinent part of the Instruction No. 35 reads as follows:

In determining the punishment to be assessed under Count I against the defendant for the murder of Julie Kerry, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

1. Whether the murder of Julie Kerry was committed while the defendant was engaged in the commission of another unlawful homicide of Julie Kerry.

. . . .

▆▆▆ The aggravating circumstances instruction for Robin Kerry's murder, Instruction No. 36, repeated Robin's name in place of Julie's in the first paragraph. When the jury returned their verdict in the punishment phase finding the aggravating circumstances, they correctly wrote the findings to reflect the intended meaning:

Whether the murder of Julie Kerry was comitted [sic] while the defendendant [sic] was engaged in the comission [sic] of another unlawful homicide of Robin Kerry.

Whether the murder of Robin Kerry was committed while the defendant was engaged in the commission of another unlawful homicide of Julie Kerry.

There was no specific objection at .trial that the name of the victim was repeated in the two instructions. Neither was the claim preserved for review in the motion for new trial. Thus, review is limited to *ex gratia* review for plain error. *Rule 29.12(b).* The jury corrected the obvious typographical errors in Instructions No. 35 and 36 and was not misled or confused in any way.

▆▆▆ A second complaint regarding the aggravating circumstances instructions was that they impermissibly confused defendant's acts with his codefendant's, as in *Isa,* 850 S.W.2d at 902. The asserted confusion emanates from the use of the phrase "whether the defendant committed the murder ... while the defendant was knowingly aiding or encouraging...." He argues that he did not commit the murders. Defendant makes these complaints regarding instructions given during the punishment stage when he had already been found guilty of two counts of first degree murder. Read in that light, the instructions are not confusing. *See §§ 565.020* and *562.041.1(2).* Additionally, the instructions did not deviate from MAI–CR3d 313.40. In contrast, *Isa* involved two instructions, 313.40 and 304.04, that had been

combined to make one instruction given during the penalty phase. The combination was found erroneous because in addition to deviating from MAI, it allowed the jury to assess Isa's punishment based on her husband's conduct. The instructions submitted here conformed to MAI–CR3d and the findings of aggravating circumstances by the jury under those instructions were amply supported by the evidence.

## XIII.

■ Defendant's next contention asserts plain error due to the trial court's failure to, *sua sponte*, interrupt the prosecutor's closing argument in the punishment phase which is here asserted to be racial in nature. Defendant, an African–American, claims the judge should have stopped the prosecutor from arguing he was a manipulating leader and should have prevented the prosecutor from describing the people defendant led as "normally female ... normally white ... normally middle-class ... normally they had a problem at home, self-esteem, something else ... not ... overly attractive."

Defendant claims these remarks were racist and should not have been allowed, citing *United States v. Doe*, 903 F.2d 16 (D.C.Cir. 1990). *Doe* was a Jamaican defendant and the prosecutor and state's witness referred to Jamaicans as a race and to that race's role in drug trafficking. Contrary to *Doe*, the state in this case did not make a sweeping generalization about defendant's race.

Defendant also argues that the state's mention of race was impermissible, citing *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987). Defendant contends the state was attempting to incite racial tensions and prejudice based on interracial dating. *McCleskey* is not dispositive on this issue. *McCleskey* merely declined to accept the Baldus study on the impact of race in imposing death sentences. In this case, since the jury was evenly racially divided, defendant's argument appears somewhat disingenuous. There is no significant likelihood that racial bias influenced the jury in this case. *See McCleskey* at 309 n. 30, 107 S.Ct. at 1777 n. 30.

■ Defendant further takes issue with the prosecutor's characterization of defendant's leadership being similar to that of Charles Manson, although Manson's name was never mentioned. Defendant relies on *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989), and *State v. Whitfield*, 837 S.W.2d 503 (Mo. banc 1992).

The purpose of the state's argument was to explain that a person does not have to be present to commit the crime if he has participated in the planning. Using evidence adduced from the defendant's witnesses, the state made the following argument:

Well, the names, you know, Charles "Tex" Watson, came to me, Patricia Krenwinkle, Squeeky Fromme. You know, these names came to me and I said, what the heck, you know, why did that jump into my mind and I couldn't understand it. And then basically it came that people who are weaker, younger, problematic, can be manipulated and dealt with by somebody who is apparently stronger, who, like their leader, you know, was a poet, played the guitar, fancied himself a songwriter, but really had a problem.

In *Newlon* the state peppered its "send a message" argument with the names of Manson, Speck, and Son of Sam, even though there was no connection of those crimes to facts in the case under consideration. In contrast to *Newlon*, the state's reference to the Manson "family" was quite limited and relevant to explain how a leader can manipulate his followers. Additionally, the court in *Newlon* found error in the totality of the state's argument which also included, "If [defendant] was going to harm your child, would you kill him? ... If you think you would have, kill him now. Kill him now ... I'm talking to you as prosecuting attorney of this county—the top law enforcement officer in St. Louis County." 885 F.2d at 1342. *Newlon* is distinguishable.

In *Whitfield*, the state referred to the defendant as a mass murderer and serial killer because he had two prior homicide convictions. 837 S.W.2d at 513. Here the prosecutor did not call defendant a mass murderer, serial killer, or the like. Thus, *Whitfield* is inapposite. While we stop short of endorsing

the argument here, the argument in this case did not rise to the level of manifest injustice, and the failure to make an objection does not constitute ineffective assistance of counsel.

 Defendant makes a tangential argument that the state exceeded permissible bounds of victim impact evidence under *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The evidence complained of included testimony that the victims held liberal political views, were caring, community involved, excellent students, advocates of social change, and "without a hateful bone in her body." In addition, during the penalty phase the prosecution presented a video of the Kerry family Christmas. "[The] state may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of specific harm caused by defendant." 501 U.S. at 825, 111 S.Ct. at 2608. The state is permitted to show the victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply "faceless strangers." *Id.* This point is denied.

### XIV.

In defendant's next point, he claims the sentence of death was disproportionate pursuant to *§ 565.035.3(3).* He argues that the verdict here violates the requirement of proportionality because of the uncertainty of the evidence of his guilt, the possibility of police or prosecutorial misconduct, and the absence of any evidence of his involvement in the killing, prior knowledge of the killing, use of a weapon or prior convictions.

 If the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases where the death penalty has been imposed, then a resentencing will be ordered. *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo. banc 1993). In this case, the defendant and his companions committed the murders in furtherance of the brutal rape and robbery of the victims. The motive of defendant and his cohorts was to escape capture and identification. A number of cases may be cited in which the death penalty was assessed where the murder was committed to avoid arrest or detection. *Ramsey,* 864 S.W.2d 320; *Six,* 805 S.W.2d 159; *State v. Grubbs,* 724 S.W.2d 494 (Mo. banc 1987), *aff'd., Grubbs v. Delo,* 948 F.2d 1459 (8th Cir.1991); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988). In other cases the death penalty has been imposed where the murder was committed in conjunction with other crimes involving force. *Hunter,* 840 S.W.2d 850; *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992); *State v. White,* 813 S.W.2d 862 (Mo. banc 1991), rev'd. on other grounds; *Six,* 805 S.W.2d 159; *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990); *State v. Petary,* 781 S.W.2d 534 (Mo. banc 1989); *Griffin,* 756 S.W.2d 475; *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985); *Betts,* 646 S.W.2d 94. In addition, defendant in this case was the oldest of the group and appeared to take on the role of leader. That fact also appears in cases where the death penalty is imposed. *Roberts,* 709 S.W.2d 857; *cf. McIlvoy v. State,* 629 S.W.2d 333, 334 (Mo. banc 1982) (death penalty found to be disproportionate where defendant had limited intelligence and education and was a weakling and a follower). In addition, here there were two murders, as well as an attempted murder. The fact of multiple homicides or multiple attempts at homicide is consistent with facts in cases where the death penalty has been imposed. *Ramsey,* 864 S.W.2d 320; *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992); *Hunter,* 840 S.W.2d 850; *Ervin,* 835 S.W.2d 905; *Powell,* 798 S.W.2d 709; *Reese,* 795 S.W.2d 69; *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988); *Griffin,* 756 S.W.2d 475; *Murray,* 744 S.W.2d 762; *Young,* 701 S.W.2d 429; *State v. Byrd,* 676 S.W.2d 494 (Mo. banc 1984).

The defendant's claims of weaknesses of the evidence of his guilt and police misconduct were resolved against him by the trial judge and the jury. Those claims do not serve as a basis for finding the sentence to be disproportionate. In addition, the evidence of the defendant's absence at the time

of the actual killing is not dispositive of the question of proportionality. The death penalty has been sustained where there was no evidence that the defendant was present at the time of the actual murder. *Six,* 805 S.W.2d 159.

Defendant cites several cases in which the death penalty was imposed but which were reversed by this Court on appeal. *Isa,* 850 S.W.2d at 902; *Whitfield,* 837 S.W.2d 503; *State v. Griffin,* 848 S.W.2d 464 (Mo. banc 1993); *State v. Wacaser,* 794 S.W.2d 190 (Mo. banc 1990). Each of those cases involved a reversible error. No reversible error exists in this case. Thus, the cases relied on by defendant do not provide a reliable basis for attacking the proportionality of the death sentence.

To summarize, the circumstances of this case are consistent with similar cases in which the death penalty was imposed and nothing in this case indicates that the imposition of the death penalty is wanton or freakish. *Ramsey,* 864 S.W.2d at 328. Accordingly, the death sentences here were not disproportionate.

## XV.

In his final point, defendant contends that the errors complained of above as well as a litany of additional errors that he asserts have the cumulative effect of depriving him of a fair trial. This Court has rejected such a "cumulative error" theory, stating that "Numerous non-errors cannot add up to error." *Hunter,* 840 S.W.2d at 869–70. Having determined that none of defendant's previous points amount to reversible error, there can be no reversible error attributable to their cumulative effect. Also, a review of the claims of error presented in defendant's final point indicates that those complaints did not deprive him of a fair trial.

## CONCLUSION

The judgments are affirmed.

All concur.