**STATE of Missouri, Respondent,**

v.

**Larry F. MARTIN, Appellant.**

**Larry F. MARTIN, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 47457, WD 49076.**

Missouri Court of Appeals,
Western District.

Feb. 7, 1995.

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SPINDEN, P.J., and LOWENSTEIN and ELLIS, JJ.

SPINDEN, Presiding Judge.

Larry F. Martin appeals from his conviction and 30 year sentence for trafficking drugs in the second degree. He asserts the trial court erred in failing to suppress the cocaine base (crack) found during an inventory search of the car he was driving and in overruling his objections to the state's use of peremptory strikes to remove two venire persons. Martin also appeals the denial of his Rule 29.15 motion; he contends he was denied effective assistance of counsel. We affirm the judgments of the trial court and motion court.

On October 4, 1991, while patrolling near Chipman Road and Westvale Circle in Lee's Summit, police officer Richard McKinley saw Martin standing at a pay telephone. McKinley obtained information about a 1978 Oldsmobile parked nearby and determined that the car's registration had expired.[1] He also learned that the plate had been assigned to a 1984 Chevrolet registered by Shevahn Bennett and a man named Robinson.

Moments later, Martin drove the Oldsmobile into, and then back out of, a parking lot. McKinley stopped Martin and asked him for his driver's license. Martin gave McKinley a receipt for a driver's license issued to Anthony L. Brown and told McKinley that his name was Anthony Brown. McKinley determined that Anthony Brown's driver's license had been suspended, so, thinking he was Brown, McKinley arrested Martin.

Another officer, Steve Grub, took Martin into custody and took him to the Lee's Summit police station. McKinley called for a tow truck to move the Oldsmobile Martin was driving because Martin had parked it on the roadway. McKinley filled out a tow form

---

1. The car had one license plate on the rear issued by Missouri. Missouri statutes require passenger cars registered in this state to display license plates on the front and rear.

and inventoried items in the car. McKinley discovered several safety inspection stickers in the car's front seat and a portable telephone.

Another officer, Gary Lane, arrived to assist McKinley. Lane discovered a glove compartment key "in the headliner of the car between the trim portion which meets the window." McKinley used the key to open the glove compartment. Inside, he found a brown paper bag containing several rocklike, opaque substances which McKinley believed to be narcotics.

McKinley talked to Martin again at the Lee's Summit police station. Martin admitted to McKinley that his name was Larry Martin and that the car did not belong to him. He said that he did not know anything about the glove box's contents. He told McKinley that Tommy Griddine had bought the car, and it belonged to Imports Plus, a used car dealership in Raytown.

The state's evidence at trial established that Imports Plus had bought the car at a Kansas City automobile auction on September 26, 1991. Griddine, owner of Imports Plus, had accompanied Martin to the auction and had bid on the automobile at Martin's request. Although Martin signed the paperwork, the car was titled in Imports Plus' name. After Imports Plus received the title, Griddine tried several times to contact Martin to let him know that he had received the title. The title later reflected that Martin's girlfriend, Shevahn Bennett, had purchased the car on October 7, 1991.

Martin testified that he bought the car at the auto auction with Griddine's assistance for Bennett. He said that Bennett took possession of the car, but he told her not to drive the car until they received the title and licensed the car. According to Martin, he borrowed the car from Bennett on October 4, 1991, because his car was being repaired. He said that he drove the car to the apartment of another girlfriend, Tonia Patterson, in Lee's Summit to take a shower and to change clothes, but she was not at home.

Martin was living with Patterson, but he said that he had left his keys at Bennett's house.

When Patterson did not come to the door, Martin said, he went to the pay telephone to call her. When Patterson did not answer the phone, Martin said that he drove back to the apartment and knocked on the door again. Martin said that Patterson still did not answer the door, so he left the apartment. Officer McKinley stopped him briefly after he drove away from the apartment.

Martin said that he gave the officer a fake driver's license because his license had been suspended for 10 years. He said he had no idea his friend's license had also been suspended. Martin claimed that he had no knowledge of the drugs found in the glove compartment, and he asserts that he did not put the glove compartment key in the visor. He admitted that he owned the mobile phone which officers found in the car.

■ In his first point on appeal, Martin challenges the trial court's admitting into evidence the crack found in the glove compartment. Martin contends that this evidence should have been suppressed because the police's inventory search violated his rights protected by U.S. CONST. amend. IV and amend. XIV and Mo. CONST. art. I, § 15 (1945). He also asserts that the search violated the police department's own regulations.[2] The state responds that Martin does not have standing to contest the inventory search because Martin disclaimed any ownership or interest in the vehicle or its contents. We agree with the state.

Martin contends that "a defendant has standing to challenge a search or seizure if the defendant was charged with an offense that includes, as an essential element, possession of the seized evidence at the time of the challenged search and seizure." He relies on *State v. Melville*, 864 S.W.2d 452, 454 (Mo. App.1993), and *State v. Lorenzo*, 743 S.W.2d 529, 531 (Mo.App.1987).

In *Melville*, this court held that a passenger of a vehicle had standing to challenge a search of a car's trunk, which contained suit-

<hr>

2. Martin does not assert any rights beyond those guaranteed in the United States and Missouri constitutions.

cases filled with marijuana. The *Melville* court stated:

> The Missouri Supreme Court has held that a defendant has standing to challenge a search or seizure if defendant was on the premises during the search; alleged a propriety or possessory interest in the premises; or was charged with an offense that includes, as an essential element, possession of the seized evidence at the time of the challenged search and seizure. *State v. Johnson*, 598 S.W.2d 123, 127 (Mo. banc 1980), cert. denied, 449 U.S. 1067, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980); see also *State v. Lorenzo*, 743 S.W.2d 529, 531 (Mo.App. 1987). Defendant was charged with trafficking in the second degree, specifically with possession of more than thirty kilograms of marijuana. ... As possession of the marijuana is an essential element of the crime as charged, defendant has standing to challenge the search of the automobile.

*Melville*, 864 S.W.2d at 454.[3] In *Lorenzo*, this court held that § 542.296.1, RSMo1986, conferred automatic standing on a defendant because it allows a person aggrieved by an unlawful seizure to file a motion to suppress. *Lorenzo*, 743 S.W.2d at 531. The court further held that standing to object to a search may be predicated "upon a possessory interest in the items seized," or would be "automatic," if "the same possession needed to establish standing is an essential element of the crime charged." *Id.* (quoting *State v. Ross*, 507 S.W.2d 348, 353 (Mo.1974)).

These cases rely on the "automatic standing rule" which was enunciated in *Jones v. United States*, 362 U.S. 257, 261–65, 80 S.Ct. 725, 730–33, 4 L.Ed.2d 697 (1980). The United States Supreme Court held that a defendant charged with an offense of which possession is an essential element may attack a search and seizure as repugnant to the Fourth Amendment even if the contraband was not within the defendant's expected zone of privacy. In short order, the Supreme Court changed its mind and overruled the automatic standing rule of *Jones* in *United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). In *Salvucci*, the Court held that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *Id.*

Both the Supreme Court of Missouri, in *State v. McCrary*, 621 S.W.2d 266, 273 n. 11 (1981), and this court, in *Wolfe v. State*, 613 S.W.2d 892, 896 (Mo.App.1981), have recognized that the automatic standing rule has been abrogated. In *Wolfe*, we said:

> *Salvucci* overrules *Jones v. U.S., supra*, and holds that persons charged with crimes, an element of which is possession, can only avail themselves of a Fourth Amendment protection if the illegal search and seizure is personal to them. Stated another way, *Salvucci* declares that an accused cannot invoke the Fourth Amendment where the illegal search and seizure is of another's person or property[.]

*Id.* Hence, we must recognize and resolve the conflict between these cases and *Melville* and *Lorenzo*.

■ To the extent that *Melville* and *Lorenzo* revive the "automatic standing rule," we overrule those cases. Instead, we hold, in accord with *Salvucci*, that before an individual can challenge a search and seizure, he or she must establish that he or she had a "legitimate expectation" of privacy in the area searched or the items seized. *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978). Hence, we must determine whether Martin suffered violation of any Fourth Amendment right.

As the U.S. Supreme Court said in *Rakas*: "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." ... A person who is aggrieved by an illegal search and seizure only through the

---

**3.** Prior to the Missouri Supreme Court's decision in Johnson, the U.S. Supreme Court reached a contrary conclusion in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In Rakas, the court held that a passenger of a vehicle had no standing to challenge the search of the glove compartment or under the seat of the car. The court's opinion said, "Like the trunk of [an] automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy." Id. at 148–49, 99 S.Ct. at 433.

introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. ... And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, ... it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Id.* at 133–34, 99 S.Ct. at 425 (citation omitted). In *Rakas,* the defendants were driving a vehicle which they did not own. The police stopped the vehicle, ordered the occupants out, and during a search of the vehicle discovered a sawed-off rifle and shells. The defendants did not admit ownership of the rifle or shells. The court said that the question of when a defendant could challenge a search turned on "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.Ct. at 429. The court found that the defendants could not challenge the search because they "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Id.* at 148, 99 S.Ct. at 433.

"The mere status of being a passenger in a vehicle does not accord the passenger a legitimate expectation of privacy in the vehicle entitling him to assert a Fourth Amendment challenge to the search of the vehicle." *State v. Kovach,* 839 S.W.2d 303, 308 (Mo.App. 1992).

Martin · denied owning the car and the drugs found in the car. He told Officer McKinley that the car belonged to Imports Plus. At trial, he and Bennett testified that he was driving the car with Bennett's consent.

Even assuming that he was driving the car with the owner's consent, he did not have a reasonable expectation of privacy in the glove compartment. He testified that he had driven the car only once, that he had no knowledge of, or interest in, the drugs found in the glove compartment, and that he did not have access to the locked glove compartment because he did .not know where the key was.

We conclude that Martin had no legitimate` expectation of privacy in the glove compartment or the contents of the vehicle he was driving at the time of his arrest. Martin, therefore, lacked standing to challenge the search of the vehicle on Fourth Amendment grounds.

■ In his second point on appeal, Martin asserts that the trial court erred in overruling his objections to the state's use of peremptory strikes to remove two black venire persons. Martin argues that the state's proffered reason for removing them was pretextual. We disagree.

Martin objected to the state's use of two of its peremptory challenges to remove the black persons from the jury panel. The state responded that the strikes were based on the race-neutral reason that the venire persons had not responded to any questions during *voir dire.* Martin argued that the state's proffered reason for the strikes was not race-neutral because three similarly situated white persons were not removed from the panel. The trial court overruled Martin's objection finding that the strikes were made for racially neutral reasons.

The Fourteenth Amendment's equal protection clause prohibits the use of peremptory challenges to exclude jurors on the basis of race. *Batson v. Kentucky,* 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). To establish a viable claim under *Batson,* a defendant must object to the prosecution's use of peremptory challenges as violating *Batson* and must identify the cognizable racial group to which the stricken venire persons belong. *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994). The state must provide a race-neutral explanation for its use of the peremptory challenges. If the prosecutor articulates a race-neutral reason, the defendant must prove that the state's proffered reasons were pretextual and were, in fact, racially motivated. *Id.* at 383–84.

"In determining whether a defendant has carried the burden of proving purposeful discrimination, the trial court should view the plausibility of the state's explanations in light of the totality of the circumstances of the . case." *State v. Aziz,* 861 S.W.2d 803, 805 (Mo.App.1993). The court should deem a

prosecutor's explanation to be race-neutral "unless a discriminatory intent is inherent in the explanation." *State v. Pullen*, 843 S.W.2d 360, 362 (Mo. banc 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 200, 126 L.Ed.2d 158 (1993).

■ Trial courts are vested with considerable discretion in determining the plausibility of the prosecutor's reasons and whether the prosecutor purposefully discriminated in exercising peremptory strikes. *Gray*, 887 S.W.2d at 384. " 'To be sufficient, the explanation need only be race-neutral, reasonably specific and clear, and related to the particular case to be tried.' " *Id.* (citation omitted). We will not overturn a trial court's decision accepting as valid a prosecutor's explanations of his reasons for exercising his peremptory strikes unless it appears to be clearly erroneous. *State v. Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

■ Factors the trial court may consider when determining whether the reason is race-neutral include: (1) the existence of similarly-situated white jurors who the state did not strike; (2) the degree of relevance between the explanations and the case to be tried; (3) the prosecutor's statements or demeanor during *voir dire;* (4) the demeanor of the excluded venire persons; (5) the trial court's past experiences with the prosecutor; and (6) other objective factors bearing on the state's motive to discriminate on the basis of race. *Aziz*, 861 S.W.2d at 805. The state's failure to use all of its strikes against venire persons of a racial minority, or the presence of a racial minority on the defendant's jury, are relevant to whether race was the prosecutor's motive for making the challenged strikes. *Id.*

The state offered this response in explanation of its peremptory strikes:

> Your Honor, all of the State's strikes were based on individuals who did not respond to any questioning during voir dire and that was the basis of the strikes.
>
> In the case of jurors number five and twenty-three, I find it hard to believe that after forty-five to sixty minutes of questioning they just have nothing to say and, based on that, we made our strikes.

Martin's attorney challenged this explanation; he insisted that three white jurors who the state did not strike had not made any statements either. The trial court, however, recalled that two of the jurors had responded to questions. The court could not recall whether the third person had responded to any questions.

■ The trial court's recollection was correct. Two black jurors did not respond to any questions during *voir dire*. Two of the white jurors to whom Martin referred did respond during *voir dire*, so they were not similarly situated. A third white juror was silent during *voir dire* and was not removed. This is a factor to be considered in determining whether the state's action was race-neutral. We conclude that the trial court was not clearly erroneous in rejecting Martin's claim of invidious discrimination. The trial court must view a claim of purposeful discrimination in light of the totality of the circumstances. *State v. Daniels*, 865 S.W.2d 400, 402 (Mo.App.1993). That the state used only two of its six peremptory challenges to strike blacks and that two other blacks served on the jury, while not dispositive, was sufficient, when coupled with the state's explanation for striking the two black venire persons, to support the trial court's conclusion that the state was not being purposely discriminatory against blacks.

■ Finally, Martin argues that the motion court erred in denying his Rule 29.15 motion because he was denied effective assistance of counsel. He asserts that his attorney was ineffective for failing to object when the state commented during trial and closing argument that Martin had not called his girlfriend, Tonia Patterson, as a witness. Martin claims that he was prejudiced by his counsel's failure to object because the state's argument "attempted to shift the burden of proof and suggested that ... Martin was concealing a crucial witness who could establish his innocence." We disagree.

Our review of the denial of a post-conviction motion is limited to determining whether the motion court's findings of fact and conclusions of law were clearly erroneous. *State v.*

*Nolan,* 872 S.W.2d 99, 104 (Mo. banc 1994). The test for whether findings and conclusions are clearly erroneous is whether our review of the entire record leaves us with the definite and firm impression that the motion court made a mistake. *Id.*

To prevail on a claim of ineffective assistance of counsel, a movant must establish by a preponderance of the evidence that his attorney did not exercise the customary skill and diligence which a reasonably competent attorney would perform under similar circumstances and that this prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Harris,* 870 S.W.2d 798, 814 (Mo. banc 1994). Prejudice exists only where trial counsel's acts or omissions are outcome-determinative: The movant must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (citation omitted). We must presume that counsel was competent. *Id.*

Twice during the trial the state referred to Martin's failure to call Patterson as a witness. Martin testified that on the day of his arrest he went to Patterson's home in Lee's Summit to shower and to change clothes. During cross-examination, Martin testified:

Q. Oh. So do you know where [Patterson] lives now?

A. Yes, sir.

Q. Where?

A. She lives in Muncie, Indiana.

Q. Oh. So then she's left the state?

A. Yes.

Q. Okay. When did she leave the state?

A. Soon after the fact.

Q. Soon after this?

A. Yes.

Q. So then she couldn't come in here and testify for us then, could she?

[MARTIN'S ATTORNEY]: Objection, Your Honor. It calls for speculation.

[MARTIN]: No, sir. Her mother worked at the Leeds plant for General Motors—

THE COURT: Overruled.

[MARTIN]: (Continuing)—and her father passed away, so she moved out with her mother.

Q. And with her in Muncie, Indiana now, address unknown, she can't come in here and clear this up then, can she?

A. There's no need for her to clear it up.

Q. Well, she could tell us where you were really going in Lee's Summit. Couldn't she?

A. Yes, she could.

[MARTIN'S ATTORNEY]: Objection, Your Honor. It calls for speculation.

[PROSECUTING ATTORNEY]: He opened it all up.

THE COURT: Overruled.

Q. She couldn't come in, could she, because she left after the fact, right?

A. Yes, sir.

Q. And as intimate and close as you are, you can't get ahold of her?

A. Yes, sir. I can call her right now.

Q. So, all along then she's known about this, right? I mean you've been under arrest since October of '91 right?

A. Yes, sir.

Q. So then she's had fourteen months to come down here, take the stand, and clear this all up, hasn't she?

A. Yes, sir.

Q. She's not coming, is she?

A. I didn't know she was involved in it.

During closing argument the state argued that the jury should draw an adverse inference from Martin's failure to call Patterson as a witness. The prosecuting attorney argued:

This brings us, folks, to something real important. It's something lawyers call adverse inference. You can infer, just like the Court has told you, against the defendant when he says, "Tonia Patterson, she could clear it all up. I talk to her every day, or I can. I can call her up. I know where she is. Of course, she left right after this. She's in Muncie, Indiana. I know where she is. I can call her up today." Folks, this has been ongoing for

fourteen months and she's not here. She could clear it up? No. Maybe she can say he wasn't there, maybe she can say, "I wasn't there," maybe she can say, "I don't know anything about it." But, folks, he thinks she can clear it up and she's not here. He knows her, we don't know her. He knows her, he could have brought her, he didn't.

 The state may comment about a defendant's failure to call a witness who is "peculiarly available" to him or her and who would be expected to testify favorably for the defense. *State v. Neil,* 869 S.W.2d 734, 739 (Mo. banc 1994). The evidence established that Patterson was Martin's former girlfriend and was the mother of his child. "It is error to hold that the witness is equally available if the relationship of the missing witness to the defendant would reasonably lead one to expect the witness to testify in favor of the defendant." *Id.* at 740. Martin knew that Patterson had moved to Indiana, and he admitted that he knew where to find her. Such evidence established that Patterson was not equally available to the state.

Martin, however, maintains that the state nevertheless was not entitled to draw an adverse inference from Martin's failure to call her as a witness because her testimony would not have been admissible. An adverse inference may not be argued if the testimony of the uncalled witness would have been cumulative or inadmissible. *State v. Sanders,* 619 S.W.2d 344, 348 (Mo.App.1981).

The state's case established that Martin's address was 6629 College in Kansas City, that there was more than $116,000 worth of crack in the car Martin was driving, and that he had been using a pay telephone shortly before his arrest. The state's evidence suggested that Martin may have been setting up a drug deal—not attempting to telephone Patterson. Patterson's testimony, therefore, could have corroborated Martin's claim that he had been living in Lee's Summit with Patterson on October 4, 1991, and that he was attempting to call her so that he could gain entrance into the apartment they shared. Martin's failure to call Patterson as a witness gave rise to an inference that her testimony would not have supported his ex-

planation of his presence in Lee's Summit. His contention that he suffered ineffective assistance of counsel is without merit.

The judgment of the trial court is affirmed.

All concur.