**STATE of Missouri, Respondent,**

v.

**Franklin L. ASHLEY, Appellant.**

**Nos. WD 49347, WD 52717.**

Missouri Court of Appeals,
Western District.

March 25, 1997.

Rebecca L. Kurz, Assistant Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Stephen D. Hawke, Assistant Attorney General, Jefferson City, for respondent.

Before HANNA, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Franklin L. Ashley appeals his convictions for burglary, rape, assault, and armed criminal action on the ground that the trial court violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by failing to sustain his objections to the State's use of peremptory challenges to strike two African–American venirepersons. He also appeals the motion court's denial, after an evidentiary hearing, of his *pro se* Rule 29.15 motion for post-conviction relief on the ground that his trial counsel were ineffective for failing to call an independent DNA expert as a witness at trial.

We find that Mr. Ashley has failed to show that the State exercised its peremptory challenges in a discriminatory fashion and affirm his conviction. We also find that Mr. Ashley has failed to show that counsel was ineffective in failing to call an independent DNA expert, and so affirm the denial of his Rule 29.15 motion.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Taken in the light most favorable to the verdict, the evidence showed as follows:

The victim lived in a house in south Kansas City, Missouri, with her two young sons and one young daughter. Her daughter slept with her, and her sons slept in a back bedroom. After midnight on April 7, 1992, the victim was awakened by a loud boom. She looked up and saw a man standing in her bedroom doorway. He demanded money, eventually taking the victim's food stamps, cash, marijuana, watches and necklace.

The victim's children began to scream. The man did not flee, however. Instead, he dragged the victim to the kitchen and obtained a knife. He then dragged her back to her bedroom, jabbed her with the knife, forced her to perform oral sex, and raped her. He stabbed her in the back, but the knife broke. Realizing her assailant was trying to kill her, the victim yelled to one of her sons to try to escape and get help, and then tried to escape herself. The assailant grabbed her, however, and began to choke and kick her. He tried to pull her into her kitchen so he could obtain another knife, but she was able to struggle out of his grasp and run to a neighbor's house and call the police. The assailant escaped before the police arrived, but the police did obtain semen and blood samples from the crime scene.

The victim was taken to the emergency room, and remained in the hospital for three to five days. While in the hospital, she was shown a photo display. She identified Mr. Ashley as her assailant, stating that she had known him for as long as she could remember. Mr. Ashley was then charged by indictment with first degree burglary, forcible rape, forcible sodomy, first degree robbery, first degree assault, and multiple counts of armed criminal action. The State subsequently filed an information in lieu of indictment charging Mr. Ashley as a prior, persistent, and Class X offender.

On the day of trial, seven of the twenty-eight members of the venire were African-American. Two of these African-American venirepersons were dismissed for cause because of health problems. Defense counsel used a peremptory strike to remove an African-American person on the venire. At the time the State began its peremptory challenges, there were thus four African-Americans left on the venire.

Counsel for the State used three of its six peremptory challenges to remove Caucasian venirepersons and three peremptory challenges to remove African-American venirepersons: Mr. Ray, Mr. Dixon, and Mr. Mays. Counsel for Mr. Ashley objected to the strikes of these three African-Americans, arguing that the strikes were racially motivated.

The prosecutor explained that she had used one peremptory challenge to remove Mr. Ray because his stepson had been prosecuted by the assistant prosecutor in this case. She explained that she struck Mr. Dixon and Mr. Mays because they had failed to respond to any questions during general or individual voir dire. She had removed the three Caucasian venirepersons for the same reason.

Defense counsel argued that the explanation for the removal of the two African-Americans for failure to respond to voir dire was pretextual, in that two additional Caucasians who had also failed to answer any questions on general voir dire were not removed. The trial judge said that, after noting the demeanor of those involved and listening to the reasons given for the strikes, he found the State's reasons for striking the African-Americans were not racially motivated or pretextual and overruled Defendant's objections. The remaining African-American served on the jury.

At trial, the victim identified Mr. Ashley as her assailant. In addition, the State's expert, John T. Wilson, testified that the Regional Crime Laboratory had subjected the semen and blood samples obtained from the crime

scene to DNA testing and analysis. He testified that the DNA pattern of the samples was consistent with Mr. Ashley's DNA pattern, and that less than ten people out of one million would have the same genetic profile as Mr. Ashley. Defense counsel engaged in cross-examination of the State's expert, but did not put on an independent defense DNA expert.

The jury convicted Mr. Ashley on the charges of first degree burglary, forcible rape, and first degree assault, as well as on two counts of armed criminal action. The jury acquitted Mr. Ashley on the counts of forcible sodomy and first degree robbery, and on two counts of armed criminal action. The court determined that Mr. Ashley was a prior, persistent, and Class X offender and sentenced him to consecutive terms of fifteen years for burglary, life for forcible rape, fifteen years for assault, and fifty years for each of the armed criminal action convictions.

Mr. Ashley filed a *pro se* Rule 29.15 motion for postconviction relief alleging that a competent independent DNA expert would have found the State's DNA expert's analysis faulty and inadequate to identify Defendant, and that his defense counsel were ineffective in failing to call such an expert to testify at the trial. At the evidentiary hearing held on this motion, Defendant offered the testimony of an expert who said it was his opinion that as many as one in five people would match the DNA profile as well as did Defendant, and that the test procedures did not preclude the possibility of contamination. Defendant argued that had this testimony been presented at trial there was a reasonable probability he would have been acquitted.

Kent Hall, one of the trial counsel for Defendant, also testified at the 29.15 hearing. He stated that prior to Mr. Ashley's trial he had the semen samples sent to an independent expert, Dr. Robert Allen, for DNA testing. Mr. Hall testified that not only could Dr. Allen not eliminate Mr. Ashley as the source of the sample, but instead Dr. Allen confirmed the Regional Crime Lab's results indicating a substantial likelihood that Mr. Ashley was the perpetrator. Because he and the other defense counsel, Leon Munday, did not want to produce further incriminating evidence, they told Dr. Allen not to conduct further testing and made the decision not to have another expert test the DNA samples. Instead, they relied on cross-examination of the State's expert at trial. The motion court found that counsel were not ineffective and denied Mr. Ashley's 29.15 motion. This appeal followed.

## II. THE PROSECUTION DID NOT USE PEREMPTORY CHALLENGES TO STRIKE VENIREPERSONS SOLELY ON THE BASIS OF THEIR RACE

On direct appeal, Mr. Ashley claims that the trial court's failure to sustain his objections to the State's peremptory strikes of two African–American venirepersons violated the Equal Protection Clause of the United States Constitution.

We will set aside the trial court's finding as to whether a prosecutor discriminated in the use of peremptory challenges only if that finding is clearly erroneous. *State v. Smulls,* 935 S.W.2d 9, 15 (Mo. banc 1996); *State v. Weaver,* 912 S.W.2d 499, 509 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996). The trial court's determination is clearly erroneous only if we are left with a definite and firm impression that a mistake has been made. *State v. Gray,* 887 S.W.2d 369, 385 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). The Equal Protection Clause of the United States Constitution prohibits the prosecution from using peremptory strikes to remove prospective jurors solely on the basis of their race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To determine whether the use of peremptory challenges violates a person's Constitutional rights, *Batson* requires us to apply a three-step analysis.

The first step in the *Batson* analysis requires the defendant to establish a prima facie claim by objecting that one or more of the prosecutor's peremptory strikes was based on race and by identifying the racial group to which the stricken venireperson or venirepersons belong. *Smulls,* 935 S.W.2d at 14; *Gray,* 887 S.W.2d at 383–84; *State v.*

*Shurn*, 866 S.W.2d 447, 456 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Once the defendant challenges one or more peremptory strikes by the prosecution, the burden of production shifts to the prosecutor to offer a race-neutral reason for the strikes. *Id.* If the prosecutor provides a race-neutral reason, then the burden shifts back to the defendant to prove that the prosecution's stated reasons for the peremptory strikes were merely pretextual and that the strikes were racially motivated. *Id.* It is not until this third step of the *Batson* analysis "that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995).

As noted earlier, in this case seven of the twenty-eight venirepersons were African–American. Two of these were dismissed for cause because of health problems, and the prosecution used three of its six peremptory challenges to strike three of the remaining African–American venirepersons: Mr Ray, Mr. Dixon and Mr. Mays.

■ As required by *Batson*, Mr. Ashley's counsel objected that the latter strikes were based solely on race and identified the venirepersons as being African–American. This satisfied the first *Batson* prong, and shifted the burden to the prosecutor to provide a race-neutral explanation for the strikes. The prosecutor explained that she struck Mr. Ray because his stepson had been prosecuted by the assistant prosecutor in this case. The trial court found that explanation satisfactory, and Defendant does not challenge that explanation on appeal.[1]

■ The prosecutor explained that she used peremptory strikes to remove Mr. Dixon and Mr. Mays because they had not responded to any questions during the general or individual voir dire. She had similarly used her other three peremptory challenges to remove the three Caucasian venirepersons who had not responded to any questions on either general or individual voir dire. The prosecutor's reason for removing Mr. Dixon and Mr. Mays is race-neutral on its face, and so satisfied the second step of the *Batson* inquiry. *See, e.g., State v. Jackson*, 925 S.W.2d 856 (Mo.App.1996); *State v. Martin*, 892 S.W.2d 348 (Mo.App.1995).[2] The burden then shifted back to Defendant to show that the ostensibly race-neutral explanation for the strikes was in fact racially motivated.

In an effort to meet this burden, defense counsel argued below and argues in this Court that pretext is shown by the fact that the prosecutor did not use peremptory challenges to remove two Caucasian venirepersons who also said nothing during general voir dire. He admits that, unlike all of the stricken jurors, these two Caucasian jurors did respond to specific questions during individual questioning. He argues, however, that the prosecutor purposely asked these two jurors one or two irrelevant questions during individual questioning just to try to create this distinction, and that she could have asked individual questions to the silent African–American venirepersons but purposely chose not to do so.

In response, the State notes that the questions it asked the two non-stricken venirepersons filled in gaps on the venire questionnaire, and that the prosecutor had asked many venirepersons such gap-filling ques-

---

1. We have previously recognized that it is permissible for a prosecutor to strike a relative of someone her office has prosecuted. *See State v. Johnson*, 930 S.W.2d 456 (Mo.App.1996).

2. In *State v. Jackson*, the prosecutor also stated he struck an African–American venireperson because she had not answered any questions during voir dire. *Jackson* held that this was not purposeful discrimination, especially because the only Caucasian venireperson who had not answered any questions during voir dire was also removed by the prosecutor. 925 S.W.2d at 864.

*State v. Martin* similarly approved the State's use of peremptory strikes to remove two African–American venirepersons who had not answered any questions during voir dire, even though a Caucasian juror had also remained silent, but was not removed. In so holding the court noted that the trial court was within its discretion in finding the strike was not racially motivated in light of the fact that the prosecutor had used only two of its strikes against the four African–Americans on the venire. 892 S.W.2d at 353.

tions. Equally importantly, the State noted that, while the prosecutor did leave those two Caucasian venirepersons on the venire, she did strike all three Caucasians who had remained silent during general voir dire and who had not answered any questions during individual questioning. Thus, the State argues, she treated the African–American and Caucasian venirepersons in the same way.

On these facts, we find that the trial court did not err in determining that the defendant had failed to show that the true reason for the peremptory strikes of the silent venirepersons was racial discrimination. First, it is well-recognized that an important factor in determining whether the defendant has proved purposeful discrimination is whether the State used peremptory challenges to remove similarly situated Caucasian venirepersons. *Smulls*, 935 S.W.2d at 16; *Weaver*, 912 S.W.2d at 509. The prosecutor had only six peremptory challenges. She used one to remove a person whose stepson had been prosecuted by her office. She used all remaining five strikes to remove the five jurors—two African–Americans and three Caucasians—who had answered no questions at all during voir dire. No strikes remained with which to remove other venirepersons.

Moreover, we note that the State had enough peremptory challenges to strike all four African–Americans left on the venire once it began its peremptory challenges, yet it struck only three of them and used three peremptory strikes against Caucasians. "The prosecutor's failure to use all his challenges against blacks is relevant to show that race was not the motive for the use of peremptory strikes." *Shurn*, 866 S.W.2d at 456.[3] In these circumstances, the fact that two other Caucasians who had answered only individual questions remained on the jury is not enough to show that the State failed to treat similarly situated Caucasian venirepersons differently. *See Martin*, 892 S.W.2d at 353.

Finally, Mr. Ashley contends that the prosecution's use of peremptory challenges resulted in a disproportionate exclusion of African–Americans. He relies on mathematic calculations to show that a larger percentage of African–Americans were removed than Caucasians. Disparate impact alone, however, will not create a *per se* violation of equal protection. *Hernandez v. New York*, 500 U.S. 352, 362, 111 S.Ct. 1859, 1867, 114 L.Ed.2d 395, 407 (1991); *State v. Parker*, 836 S.W.2d 930, 934 (Mo. banc), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992); *State v. Davis*, 894 S.W.2d 703, 706 (Mo.App.1995).

For all of these reasons, we reject Mr. Ashley's *Batson* challenge and affirm the conviction.

### III. *FAILURE TO CALL AN INDEPENDENT EXPERT WITNESS AT TRIAL DID NOT CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL*

In support of his claim of error in denial of his Rule 29.15 motion, Mr. Ashley claims that his trial counsel were ineffective in failing to call an independent expert to refute the state's DNA evidence. He argues that an independent expert could have testified that the State's DNA test results were incorrect and unreliable, that as many as one in five people have a genetic profile similar to Defendant's, and that the DNA sample may have been contaminated during testing.

Our review of the denial of Mr. Ashley's 29.15 motion is limited to whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(k); *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995). Findings and conclusions are clearly erroneous only if, after a review of the entire record, we are left with the definite and firm impression that a mistake has been made. *State v. Storey*, 901 S.W.2d 886, 893 (Mo. banc 1995).

To prove a claim of ineffective assistance of counsel, Mr. Ashley must show by a pre-

---

**3.** In *Shurn,* the prosecutor used four of six peremptory challenges to strike African–American venirepersons but left two African–Americans on the panel. *Shurn* held that the prosecutor's failure to use his last two strikes to strike the remaining two African–Americans weighed in favor of finding that the strikes were not based on race. *Id.*

ponderance of the evidence that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would have exhibited under similar circumstances and that he was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Storey,* 901 S.W.2d at 893. To show prejudice, Mr. Ashley must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

■ Reasonable decisions of trial strategy will not support a finding of ineffective assistance of counsel. *State v. Harris,* 870 S.W.2d 798, 814 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Choice of witnesses is a matter of trial strategy. *State v. Johnson,* 901 S.W.2d 60, 63 (Mo. banc 1995); *Harris,* 870 S.W.2d at 816.

■ In this case, Mr. Ashley's trial counsel, Mr. Munday and Mr. Hall, conducted an adequate investigation of the law and the facts. They obtained an independent expert to analyze the samples and to critique the State's results, but the expert confirmed the State's findings. Mr. Hall testified that counsel therefore made a strategic decision not to call Dr. Allen or some other expert to testify at trial because he could not eliminate Mr. Ashley as the source of the samples.

Defendant suggests that this decision was not reasonable, because his attorneys should have had enough knowledge about how to interpret DNA evidence to realize that the State's evidence was subject to attack along the lines suggested by the defense expert who testified at the 29.15 hearing. Defendant further suggests that defense counsel currently are far more knowledgeable about DNA evidence and that they should have had such knowledge at the time of Mr. Ashley's trial.

We disagree. First, according to testimony by Mr. Hall at the 29.15 hearing this was the first case tried by this Public Defender's office in which DNA evidence was used. In this circumstance, it would not be reasonable to expect Mr. Ashley's attorneys to have the knowledge or experience with DNA evidence that they have gained in the years since Mr. Ashley's trial. The Supreme Court has recognized that the reasonableness of counsel's performance is to be judged by prevailing professional norms. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

Even more basically, however, it would be unreasonable even today to expect trial counsel to personally become expert in the interpretation of DNA evidence or of other scientific evidence, and to hold that counsel is incompetent if he or she fails to do so. Where the subject matter at issue requires expert knowledge in an area in which counsel is not expert, an adequate investigation of the law and facts will normally require counsel to consult an expert. Here, however, defense counsel did consult such an expert. That expert simply was not able to provide the defendant with a good defense to the State's DNA evidence. Instead, that expert confirmed the State's expert's analysis and indicated that he also could not exclude Defendant as the perpetrator.

■ In this circumstance, counsel were not required to contact yet another expert to see if that expert agreed with the first one, as Defendant in effect now suggests. "Strategic choices made after thorough investigation of the law and facts are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support limitations on investigations." *State v. Twenter,* 818 S.W.2d 628, 635 (Mo. banc 1991).

This rationale applies here. Defense trial counsel exercised the skill and competence of reasonable attorneys under similar circumstances in determining that, as a matter of trial strategy, it would be better to limit their DNA investigation at that point by not undertaking further independent DNA analysis which might corroborate the State's results, and to instead rely on cross-examination of the State's expert. Moreover, the mere fact that, some years later, defendant was able to find an expert who did not think that Dr. Allen was right in agreeing with the State's DNA analysis does not mean that defense counsel could have found such an expert at

the time of trial or that they were ineffective in failing to do so.

For the foregoing reasons, we affirm Mr. Ashley's conviction and affirm denial of his Rule 29.15 motion.

All concur.